**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 22-cr-00052-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DONNIQUE HESTER,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Sentencing Hearing)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 1:06 a.m. on the 17th
day of August, 2022, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
THOMAS JOHN MINSER, U.S. Attorney's Office, District of
Colorado, 1801 California Street, Suite 1600, Denver, CO
80202

**FOR THE DEFENDANT:**
WADI F. MUHAISEN, Muhaisen & Muhaisen LLC, 1435 Larimer
Street, Suite 203, Denver, CO 80202

1          **AUGUST 17, 2022**

2          (Proceedings commence at 1:06 p.m.)

3          THE COURT:  You may be seated.

4          Good afternoon.  The Court calls Criminal Case No.

5    22-cr-00052-CMA, encaptioned United States of America v.

6    Donnique Hester.

7          Counsel, would you please enter your appearances.

8          MR. MINSER:  Good afternoon, Your Honor, Thomas

9    Minser for the United States.

10         THE COURT:  Good afternoon.

11         MR. MUHAISEN:  Good afternoon, Your Honor, Wadi

12   Muhaisen on behalf of my client, Mr. Hester, who is seated

13   at the table.

14         THE DEFENDANT:  Good afternoon.

15         THE COURT:  For the record, the Court notes that

16   Officer Michelle Sinaka, representing the United States

17   Probation Office, is also in attendance at this hearing.

18   Good afternoon.

19         PROBATION OFFICER:  Good afternoon, Your Honor.

20         THE COURT:  All right.  Mr. Muhaisen, would you and

21   Mr. Hester please approach the podium.

22         MR. MUHAISEN:  Yes, Your Honor.

23         THE COURT:  The record shows that Mr. Hester was

24   charged by Indictment dated February 9, 2022, with two

25   counts of bank robbery and felon in possession.  The

1    record also shows that on May 31, pursuant to a plea

2    agreement, he pled guilty to and was convicted of both

3    counts.

4           Mr. Muhaisen; is that correct?

5           MR. MUHAISEN:  Yes, Your Honor.

6           THE COURT:  All right.  We are here today for

7    sentencing.  I have received and reviewed the full

8    presentence investigation report dated July 7, 2022,

9    including all addenda thereto.

10          I have also reviewed the defendant's -- Document

11   No. 30, the defendant's objections to the presentence

12   report.

13          No. 32, the Government's response.

14          No. 31, the Government's motion for a 3-level

15   decrease in offense level for acceptance of

16   responsibility.

17          Are there any documents that I failed to identify

18   that I should have reviewed in preparation for this

19   hearing?

20          MR. MINSER:  Nothing from the Government, Your

21   Honor.

22          MR. MUHAISEN:  No, Your Honor.

23          THE COURT:  All right.  Mr. Muhaisen, have you had

24   enough time to review the presentence report with

25   Mr. Hester?

1            MR. MUHAISEN:  Yes, I have.

2            THE COURT:  Did you explain the contents of that

3    report to him?

4            MR. MUHAISEN:  Yes.

5            THE COURT:  Do you have any concerns about his

6    ability to understand the contents of that report?

7            MR. MUHAISEN:  No, Your Honor.  Mr. Hester is very

8    capable.

9            THE COURT:  All right.  So, Mr. Hester, did you

10   review the presentence report?

11           THE DEFENDANT:  Yes, ma'am.

12           THE COURT:  Did you discuss it with Mr. Muhaisen?

13           THE DEFENDANT:  Yes.

14           THE COURT:  Do you understand the contents of the

15   report?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  All right.  Mr. Muhaisen, you submitted

18   Document No. 30, it was an objection, but no support,

19   essentially just taking issue with the advisory guideline

20   range being 92 to 115 months, but there was no argument or

21   facts to support that.

22           MR. MUHAISEN:  Your Honor, I revisited my client's

23   criminal history subsequent to that filing, so I am

24   withdrawing that.

25           THE COURT:  So the objection is withdrawn.  Does

1    the defendant wish to make any additional objections at

2    this time?

3            MR. MUHAISEN:  No specific objections, Your Honor,

4    but the only thing I would bring up is during the

5    providency hearing, Mr. Hester did lodge an objection to

6    some of the factual characterizations of the bank

7    incident.  I was planning on just re-addressing that in my

8    argument, but I don't know if the Court wanted me to do

9    that now.

10           THE COURT:  Only if you are making formal

11   objections as opposed to -- are they clarifications and,

12   if so, why were they not submitted to the probation

13   officer?

14           MR. MUHAISEN:  Well, Mr. Hester put it on the

15   record at the plea hearing, but the Court is correct, I

16   didn't follow up with that.

17           THE COURT:  It should have been submitted -- if

18   there are objections, that should be submitted to the

19   probation office so they have an opportunity to respond.

20           MR. MUHAISEN:  It is a very small factual

21   distinction.

22           THE COURT:  All right.  Go ahead and put it on the

23   record.

24           MR. MUHAISEN:  In the U.S. Bank incident, in

25   paragraph 13, there was an accusation that the defendant

1    slammed his hands on the counter, raised his voice, and

2    stated "give me the money."  And Mr. Hester, while

3    admitting the rest of that paragraph, denies that that

4    specifically happened.

5         THE COURT:  All right.

6         MR. MUHAISEN:  That is all.

7         THE COURT:  All right.  Well, that is noted by the

8    Court.  It was not taken into account in computing the

9    advisory guideline range, and this Court will not consider

10   it for purposes of the sentence that it imposes.  So I am

11   not going address it any further.

12        MR. MUHAISEN:  Thank you.

13        THE COURT:  Mr. Minser, does the Government wish to

14   make any objections at this time?

15        MR. MINSER:  No, Your Honor.  Thank you.

16        THE COURT:  The Government has filed a motion

17   pursuant to United States Sentencing Guideline Section

18   3E1.1(b) requesting that this Court grant the defendant a

19   full 3-level decrease in offense level for acceptance of

20   responsibility.  That motion, Document No. 31, is granted.

21        This results in a total offense level in this case

22   of 23.  The defendant's Criminal History Category is a VI.

23   That results in an advisory guideline range of 92 to 115

24   months of imprisonment, 1 to 3 years of supervised

25   release, and a fine in the range of $20,000 to $200,000.

1          As part of my protocol for determining whether the

2     advisory guideline range is a range that is sufficient,

3     but not greater than necessary, to achieve the objectives

4     set forth in 18 United States Code Section 3553, I have

5     reviewed the presentence report, I have considered the

6     sentencing guidelines, and the factors set forth at 18

7     United States Code Section 3553.

8          I did not see any request for a downward departure

9     or for a variant sentence.  So rather than do what I

10    normally do and tell you what I am thinking, I will let

11    counsel make their arguments and then I will tell you

12    where I am coming from.

13         Mr. Muhaisen?

14         MR. MUHAISEN:  Thank you for the opportunity on

15    behalf of Mr. Hester.  First, I would just like to talk

16    about some background for Mr. Hester and his life.  He was

17    born in Denver, but he happened to have been moved around

18    the country quite a bit due to some family moves.  He

19    spent some time in Cleveland, Ohio, as a child with his

20    grandmother, and there were problems with resources with

21    him growing up and stability.

22         One notable example that he mentioned to the

23    probation officer and myself in the interview was that

24    when he was placed in Cleveland, Ohio, as a child in his

25    grandmother's household, that there were several cousins

1   living there and there wasn't sufficient food to eat, so

2   he would get in fist fights with his cousins over who

3   could get food and more food.  That has had a lasting

4   effect on him.

5        His mother entered into relationships with various

6   men, including a couple of stepfathers that Mr. Hester

7   had.  He witnessed domestic violence against his mother,

8   who is in the courtroom, by the way.  He witnessed as a

9   child domestic violence against his mother.  He didn't

10  have a stable home very often as a child.

11        There was a Mr. Anderson that was a stepfather.  He

12  was "whooped," in his own word, by this stepfather quite a

13  bit and witnessed domestic violence.  Mr. Anderson was a

14  father figure to him, but he would use boards and cords on

15  him for corporal punishment or discipline.  Mr. Hester

16  then found his biological father, who was in prison.

17        So that is a longwinded way of saying, Your Honor,

18  that the very beginning of Mr. Hester's life lacked

19  stability, lacked proper bonding with adults, and I submit

20  to the Court, got him to a very rough start.  He ended up

21  tiring of the stepfather's punishments, and he ran away

22  from home at a very young age.

23        Fast forward, he ended up back in Denver again.

24  His mother was a career woman at that point; she drove a

25  bus.  Mr. Hester found himself being the caretaker to his

1    siblings, including cooking for them and taking care of

2    them, cleaning, trying to get them ready for school.  He,

3    himself, lacked all of the qualities necessary to do that

4    because of his background, but he still made an attempt to

5    do that.

6         Now, Your Honor, Mr. Hester does not contest or

7    deny, obviously, that he has a lengthy criminal history

8    that began shortly after he ran away from home in his

9    mid-teens.  The first indication of trouble with the law

10   was when he was 16, I believe.  And I know the Court has

11   reviewed his criminal history.

12        I am not going to go through every conviction, but

13   I do want to highlight for the Court several, because the

14   vast majority of the convictions he has over his life,

15   from being a teenager to adulthood, are from the cluster

16   of crimes that I think the Court, based on its experience,

17   will recognize as someone who has trouble with both

18   homelessness and substance abuse.

19        So I am not reading them all, but you look at

20   shoplifting at the age of 19, a traffic case at the age of

21   20, false information at age 22, destruction of private

22   property at 25 years old, shoplifting again at 25,

23   loitering at 25, possession of drug paraphernalia at 25

24   and three times when he was 30 years old, other various

25   trespasses when he was in his 20s and 30s, more traffic

1    cases.

2         So you see possession of drugs, possession of drug

3    paraphernalia, driving without a valid license, and I can

4    tell the Court, when I see charges -- when I get a new

5    case in state court, for example, and I see things to do

6    with trespassing and paraphernalia and failure to obey an

7    order, like that cluster of things indicates that this is

8    someone who's struggled with homelessness and substance

9    abuse.

10        Now, unfortunately, the probation department

11   successfully or accurately states that many of the

12   documents from a lot of, for example, the general session

13   cases in Denver County are not available, and that is

14   true, they purge those after a long time.  But I think

15   from the charges, themselves, the Court can, I think,

16   extrapolate that so much of his criminal history was based

17   on those things.

18        None of it excuses any of it, and I don't want the

19   Court to take it that way, I would just like to give

20   context.  Mr. Hester had the types of crimes that I

21   indicated through his 20s and 30s, and wrapping up,

22   disturbing the peace at 30, drug paraphernalia three times

23   at 30, possession of drugs at 34, trespass at 36, and then

24   my reading is there were no convictions between the ages

25   of 36 and 46.

1        So, from talking to my client, I know that he was

2   trying to make an effort to stabilize his life and try to

3   figure out housing, because getting stable housing leads

4   to the other successes, whereas a lot of shelters require

5   sobriety and to be substance free before you get the

6   housing, or federal housing doesn't permit certain

7   criminal convictions to have government housing

8   assistance.  But he still managed for a decade, basically,

9   between the ages of 36 and 46, not to be convicted of any

10  crime.

11       At the age of 46 there was another theft, I

12  believe, and a possession of drugs.  Then the more serious

13  crime that preceded this one resulted in a 10-year

14  sentence to the Department of Corrections.  So it is a sad

15  story he improved on, and it looked like he was going turn

16  the corner, but he is human, and with his human frailties,

17  he lapsed back and then he ended up paying a significant

18  price in the State Department of Corrections.

19       The two incidents that he's admitted to here, Your

20  Honor, and I will call them the bank incident and the

21  weapon incident, the bank incident, obviously, again, no

22  excuses being made for him, he was having trouble with

23  finances, he didn't have any leads, he also was

24  unfortunately finding a connection with the wrong people,

25  and the people he was around during the possession of a

1    weapon incident in this case are a perfect example of

2    that.  One was his nephew, and others were people that

3    were bigger fish than him when he was standing on the

4    street that day.

5         But addressing the bank incident, there was no

6    actual weapon with him.  And I know that that doesn't help

7    with the teller, because she doesn't know that.  We are

8    admitting that.  But for the sake of just confirmation, he

9    did not have a gun at the U.S. Bank.  He did not engage in

10   any violence.  He used verbal tactics to get the money,

11   and he did.

12        Then, in terms of the possession of a weapon case,

13   again, it's that instability and the wrong people he is

14   hanging out with.  That whole incident turned into quite a

15   mess.  I was appointed as alternate defense counsel in the

16   Denver District Court on that case before they dismissed

17   it when he was indicted and the U.S. Attorney decided to

18   prosecute him here.  So I am pretty familiar with the

19   early aftermath of his arrest and everything like that,

20   and I met with him soon after that and he was in very,

21   very bad physical shape.

22        He panicked when they basically attached him to a

23   gurney and were going to inject him with a substance.  He

24   wasn't sure what that was, and he was concerned that in

25   the past he has had very severe reactions to the same type

1    of injection, so he panicked, and they strapped him down.

2         So I don't think the Court should look at that as

3    something where he was trying to be violent and attack the

4    police, he had a panic attack, basically, and he suffers

5    from asthma, as well, and he was strapped down.  But the

6    fact of the matter is, he understands he is not supposed

7    to possess a weapon, and that is why he has taken

8    responsibility.

9         Now, present in the courtroom is Mr. Hester's

10   mother, and I also met with Mr. Hester's wife.  They are

11   common-law married.  They hold themselves out as married.

12   And I met with her before the hearing, and I know I didn't

13   file a variance based on this, Your Honor, I don't think

14   the statute requires me, necessarily, to pre-file

15   variances, but I would ask the Court to consider a

16   variance based on Mr. Hester's wife, and I will explain.

17        When Mr. Hester got out of the Department of

18   Corrections, unlike the previous time in his life, without

19   any stability of housing and et cetera, he met Raquel

20   Valencia, and she has had the same stable home for 4

21   years, and the probation officer did visit her home and

22   included that in the report.

23        That was the first time that Mr. Hester had a

24   stable relationship that was going to last and also a

25   stable home.  And Ms. Valencia has health issues.  And she

1    informed me this morning that those health issues that she

2    had indicated to me prior were actually getting much

3    worse.

4         Specifically, she has degenerative arthritis in her

5    knees and ankles.  She has two herniated discs in her

6    lower back, and she has diminished vision that is

7    consistently getting worse.  And so I would ask the Court

8    to consider family circumstances in terms of a variance

9    because Ms. Valencia has struggled mightily to find a

10   caretaker.  There is a family friend here that is a

11   caretaker for her part time, but she can't do it in the

12   evening.  And if Mr. Hester was able to come home at some

13   time soon, he would be her caretaker at all times.  And he

14   was starting to do that before this case.

15        And so I think there is some case law that the

16   courts, I am sure, are familiar with, that supports a

17   finding of extraordinary family circumstances.  I know in

18   this Circuit, in *United States v. Munoz-Nava*, 524 F.3d

19   1137, in 2008, the record supported finding extraordinary

20   family circumstances.  The defendant took care of his

21   8-year old son as a single parent and had elderly parents

22   with serious medical problems, and there are other cases

23   that I'll omit for the time being, but I think that his

24   wife -- so, in terms of personal characteristics and

25   family characteristics, on one hand Ms. Valencia providing

1    a home for the first time, a stable home for Mr. Hester,

2    is a personal characteristic that should be considered.

3    And then similar to Munoz-Nava, the family circumstances

4    of a person that is struggling mightily with health

5    issues.  So I would ask the Court to consider that as a

6    variance to go below the minimum of the guidelines.

7         I did want to share with the Court that in addition

8    to Exhibit B of the sentencing recommendation, which is a

9    transcript of all of the efforts that Mr. Hester has been

10   making to educate himself and enrich himself, I won't

11   submit it, but I have an amended one that has a few more

12   dates since the April 23, 2022, date, or April 30, 2022,

13   date.  I have more evidence of further classes into May.

14   He is studying history.  He is doing employment and job

15   hunting skills courses.

16        Finally, Your Honor, something else that I

17   personally observed -- and I will say this, you know,

18   fully understanding that the Court has heard a lot of

19   sentencing arguments and has heard many, many defendants

20   have found God when they are about to be sentenced.

21        THE COURT:  They always find God.  Their eyes have

22   opened.  They have seen the light.

23        MR. MUHAISEN:  So Mr. Hester had previously had an

24   interest in the Islamic faith.  He will fully admit to the

25   Court that he has not even come close to meeting what he

1    believes a good Muslim should be like in his life.  He

2    fully admits that.  He has really engaged in his Muslim

3    faith since he has been incarcerated in this case.  He

4    actually views it as a blessing that he has been able to

5    be incarcerated for these past months, be away from those

6    demons, and also b e able to focus on scripture.

7          And I can tell the Court, as an Arabic speaker,

8    that I was stunned to hear Mr. Hester reciting prayers in

9    the Arabic language, because the Quran is in the Arabic

10   language, and traditionally you are supposed to pray in

11   the Arabic language, and not do your five-day daily

12   prayers, reciting them in English or another language.

13   But not only is he reciting in Arabic, he is meeting with

14   a prison Imam Chaplin that comes in.  He also requested a

15   specific Quran that he wants a certain transliteration.

16   Like, this is very legitimate engagement in religion.

17         He is studying the history of religion, everything

18   from the founding of Islam to the Moorish conquest of

19   Spain and the interfaith stuff that happened in Spain.  I

20   was very impressed to hear all of that.

21         And I would submit to the Court in summary that

22   there is a lot going against Mr. Hester here with this

23   long criminal history.  There is not a part of his life

24   that the Court doesn't see him committing crimes, and that

25   makes it difficult for me to argue for leniency.

1       But what I would say is everybody is redeemable.

2   Everybody can have that eureka moment.  Mr. Hester seems

3   to have a coalescence of various things that are going for

4   him now, including a stable relationship with his wife, a

5   supportive mother and family now, finding spirituality,

6   stable housing, and this intellectual pursuit and all of

7   the stuff in Exhibit B.

8       I think Mr. Hester does have a chance here, and if

9   the Court looks at the U.S. Sentencing Commission's major

10  research project that they did about recidivism -- forgive

11  me, Your Honor, I have it saved on my phone --

12  specifically when they compare the recidivism of young

13  males versus more aged males:  Offender sentence when

14  younger than 21 had a 71.1 percent rearrest rate.  On the

15  other end of the spectrum, 14 percent of offenders are

16  sentenced after age of 60.  And then if you break it down

17  further, that keeps going down by age group.  And then

18  Mr. Hester is in his early 50s, so it drops from 71.1

19  percent recidivism, if you are under 21, and when he is 51

20  to 60 years old, it drops down to 21.7.  And when you are

21  older than 60, as a male, it is 14 percent.

22      So there is a consistent decline in recidivism as

23  someone ages.  So even someone that has an extensive

24  criminal history does tend to show a lower recidivism

25  rate.  And the Court might think to itself, well, he

1    hasn't shown that he has declined in as many crimes as

2    he's gotten into in his 30s and 40s, and that is very

3    true.

4         But getting into 50s, plus the stability of the

5    wife in the home, plus the spirituality, I think all

6    together should be considered, family characteristics and

7    personal characteristics.  And we would ask the Court to

8    consider a lower sentence than the minimum of the

9    guideline here.

10        Does the Court want Mr. Hester to address the Court

11   now or after?

12        THE COURT:  No.  I like to hear from the

13   Government, and then I like to hear from him last.

14        MR. MUHAISEN:  Thank you, Your Honor.

15        THE COURT:  Mr. Minser?

16        MR. MINSER:  Thank you, Your Honor.  Your Honor,

17   the defendant is 53 years old now.  He has in his lifetime

18   achieved 40 counts of conviction on criminal charges; this

19   dates back to 1985.  So this is for decades now, the

20   defendant has been under some sort of criminal sentence,

21   either supervision or incarceration.

22        Counsel noted that approximately 10-year period,

23   when the defendant was 36 to approximately 46 years old,

24   where there is seemingly no convictions, but that just

25   happens to be the time he was incarcerated on a charge,

1    and that is why there are no convictions from that time

2    period.

3         But, Your Honor, that also has to be taken into

4    context, too, especially when considering what occurred in

5    this case with the bank robbery.  I am sure the Court

6    noted, this is the third time he has robbed the same bank.

7    You think it would have gotten through to him after he got

8    caught the first time robbing that bank, but he went back

9    twice more, and the time frames on these are incredibly

10   telling.

11        The defendant got released from incarceration on

12   3/12 of 2015.  The bank robbery, the first one, occurs on

13   3/20 of '15, eight days later.  And then bank robbery

14   number two occurs on September 14, 2015.  This is a very

15   short time period, and defendant has robbed the same bank

16   twice.  That leads to our case years later, where he robs

17   it a third time.

18        Your Honor, there are -- counsel noted that

19   oftentimes in this courtroom we hope these sort of

20   convictions and sentences have a eureka moment with

21   defendants.  We do.  I think prosecution, defense, the

22   Court all hopes that.  But in this case, I don't see much

23   room for that hope.  I think it is highly likely the

24   defendant is going to be back, and that is just based upon

25   his criminal history, Your Honor, he has shown us since

1    1985.

2         And if you look at the PSR, Your Honor, you can

3    look at what his plans are for the future.  I understand

4    he is the caregiver for Ms. Valencia, but Ms. Valencia was

5    trying to cover up what he did in this case.  She is part

6    of the problem.  Going back to that situation, he is going

7    to end up in the same place right here.  The fact he

8    believes it is appropriate tells me he hasn't learned a

9    thing.

10        That is why, Your Honor, the Government is

11   requesting a bottom-of-the-guideline sentence of 92 months

12   of imprisonment, to be followed by 3 years of supervised

13   release, along with restitution in the amount of $180 to

14   U.S. Bank.  Thank you.

15        THE COURT:  Thank you, Mr. Minser.

16        Mr. Hester, do you wish to make a statement to me

17   on your own behalf?

18        THE DEFENDANT:  Yeah.

19        THE COURT:  You may.

20        THE DEFENDANT:  Madam Judge Arguello, I know that

21   I'm in front of you and, like, the last 4 months of when I

22   was free out in the world, I -- how can I say this -- I

23   think I was doing good.  I was making headway.  I quit

24   doing drugs, and I still am drug free right now.  But I

25   did this before I got locked up, I stopped doing drugs.

1          What I did in the bank, I shouldn't have did, and I

2     know that I did wrong.  But I did it out of desperation.

3     I didn't have no money.  I owe some very dangerous people,

4     who were going to kill me.  They already, you know, pulled

5     the guns out on me and told me I better have their money

6     within three days or I'm dead.  So I did what I did out of

7     desperation.

8          And I apologize to the Court.  I apologize to my

9     wife, who didn't even know nothing about this even before

10     I met her.  And I apologize to my mom.  My mom, you know,

11     she raised me to be a man, and in all things, to accept

12     responsibility for what I did, and I do that.

13          I got a CSP two years ago.  I came out with a

14     demeanor filled with passion, purpose, and intent.  And

15     that was the bright side of the token.  Unbeknownst to me

16     was the flip side, the long, very dark, brutal

17     characteristics gained from enduring reality of places

18     that I am about to go to, where I seen my cellie get

19     stabbed up.  I wanted to help him, but I couldn't.

20          How can I say it?  I'm afraid -- I was afraid for

21     my life.  That is the only reason why I did what I did,

22     and I did that out of desperation, and I apologize to the

23     Court, my wife.  I worked for my mom for like 3 months as

24     a caregiver for her for no pay, and I did it with my wife

25     like the first 2 months, and then she said, "babe, you can

1    get paid."  So I went down there and I applied and they

2    hired me, and I was doing good.  I didn't commit no crimes

3    in that time.  I worked.  I saved my money up.  I didn't

4    do no drugs, because, if I did, my mom and my wife would

5    beat me up.

6         But, yeah, how can I say it?  I think I am in a

7    good place right now.  Even right now I am glad to be in

8    here and able to say that, to tell the truth.  And I am

9    not going to hide nothing from nobody.  I am 53 years old.

10   I have lived a little longer than the average person.

11        Yes, I have done some bad things in life, but I

12   believe that due to my time in brutal places, you have to

13   act -- when you gotta perform, you gotta perform.  One

14   thing I can say now is I can think now.  I don't do things

15   on impulse.

16        I regret what I did, because now my wife don't have

17   her arms and her legs, which is -- sorry.  I just want to

18   make amends, not only to myself, to my mom.  I want to see

19   her be able to see me right before she dies, because she

20   is losing her memory due to Alzheimer's.  In 5 to 6 years

21   she may not even remember me.

22        My wife, she don't feel safe in the house.  I would

23   like to show you some pictures, if I can find the

24   pictures, this is the --

25        MR. MUHAISEN:  Would the Court like to review those

1    photos?

2         THE COURT:  You can give them to the courtroom

3    deputy.

4         THE DEFENDANT:  Like that is the front and the back

5    door.  Me and my wife had to have those put on the front

6    and back door.  She is afraid.  She hears people at night

7    sometimes.  She is afraid.  She is handicapped.  She says,

8    "Baby, I don't feel safe when you are not here."  And that

9    is the picture of me and her together.

10        I know I am going to do my time like a man, and I

11   just wish mercy on the Court, like, hopefully that I can

12   do my time in Englewood, where my wife can see me still

13   and we can see each other and see my mom, also.  That's

14   all I have to say.

15        THE COURT:  All right.  Thank you.  As a result of

16   the United States Supreme Court's rulings in *United States*

17   *v. Booker* and *United States v. Fanfan*, the United States

18   Sentencing Commission Guidelines have become advisory to

19   this Court.  Although this Court is not bound to apply

20   those guidelines, it has consulted them and taken them

21   into account along with the factors set forth at 18 United

22   States Code Section 3553(a).

23        These factors include that the defendant is 53

24   years old.  He is before this Court after pleading guilty

25   to his eighth felony conviction, his second federal

1    firearms conviction, and his first federal bank robbery

2    conviction.

3          As the Government noted, the defendant's criminal

4    history began in 1985, when he was only 15 years old, and

5    he was at that time adjudicated of misdemeanor third

6    degree sexual assault.  And since that time he has

7    sustained at least 40 counts of conviction for non-traffic

8    related crimes, and I will not go through all of those

9    here, but it is a long list.

10         In this case, on July 13, 2021, he entered the U.S.

11   Bank, approached the teller, told the teller to give him

12   $700.  It is indicated that the teller initially was

13   confused, thought, I guess, perhaps that he was doing a

14   withdraw, but soon realized that it was a bank robbery.

15   She handed the defendant $180 and the defendant fled the

16   building.

17         THE DEFENDANT:  Your Honor, can I say one thing?

18   Excuse me, please.  I never asked her for $700.  I never

19   said that.  I never hit the counter.  I never did none of

20   that.

21         THE COURT:  I didn't say you hit the counter.  It

22   just seems sad to me that if it was $700 that that is when

23   you went in to get, you are losing your life, essentially

24   for 92 months, at least, for that robbery.

25         THE DEFENDANT:  Yeah.

1          THE COURT:  That is the sad part to me of this

2    whole thing.  You essentially sold 92 months of your life

3    for $700, which you didn't even get.

4          THE DEFENDANT:  But I didn't ask for that.  I

5    didn't ask for no amount of money, Your Honor.  I never

6    said that to the teller.

7          THE COURT:  What did you tell her, you are being

8    robbed, give me the money?

9          THE DEFENDANT:  Yeah.

10          THE COURT:  Okay.  Well, you got $180, and that is

11    essentially what your winnings were from that robbery.

12          Later, on November 30, 2021, during a surveillance

13    of a high-crime housing complex, the defendant was

14    observed moving to the back of the dodge caravan while

15    holding his waistband in a manner that indicated he had a

16    weapon.  He fled towards his residence when an officer

17    pursued him.  He did hold the firearm apparently in his

18    hand, and he was tackled in the doorway of his residence

19    and the gun fell to the ground.  It was a Hi-Point C9 9mm

20    gun with a magazine loaded with eight rounds.

21          And during his arrest, the defendant told his

22    girlfriend, or wife as he says today, Raquel Valencia, to

23    grab his keys and lock the Dodge Caravan, apparently

24    because it had a handgun and digital scale.  She

25    apparently did as he told her to do which, as the

1    Government says, just aided and assisted this defendant.

2         Further investigation indicated that the Dodge

3    Caravan was a car-jacked vehicle, and it had a black Sig

4    Sauer P320 9X19 mm semi-automatic pistol, which had five

5    live rounds in it.  There was marijuana, three smoking

6    glass pipes, and a weighing scale.

7         The probation officer has pointed out that despite

8    having served several years in prison and being on parole

9    for similar conduct, criminal conduct, bank robberies, it

10   has not deterred the defendant from possessing a weapon or

11   robbing banks.  In this case, he robbed this same United

12   States bank three times.

13        The oral motion for a variant sentence based on his

14   wife's circumstances is denied.  The Court does not have

15   enough information before it to indicate that this falls

16   within the guidelines and, even if it did, it is not like

17   he has no one who can take care of her.  It just doesn't

18   merit a downward departure or variance.

19        Neither the Government nor the defendant has filed

20   any objections to the presentence report, therefore, the

21   factual statements and guideline applications in the

22   report are adopted without objection as the Court's

23   findings of fact concerning sentencing.

24        The Court finds that the total offense level is 23.

25   The defendant's Criminal History Category is a VI.  That

1   results in an advisory imprisonment ranges of 92 to 115

2   months and a fine range of $20,000 to $200,000, with the

3   supervised release range of 1 to 3 years.

4        The Court finds no reason to depart or vary from

5   the guideline range which does not exceed 24 months and

6   will impose a sentence within that range.

7        Pursuant to the *Sentencing Reform Act* of 1984, it

8   is the Judgment of the Court that the defendant, Donnique

9   Hester, is hereby committed to the custody of the Bureau

10  of Prisons to be imprisoned for a term of 92 months on

11  each count, to be served concurrently to one another.

12       Upon release from imprisonment he shall be placed

13  on supervised release for a term of 3 years on each count,

14  also to be served concurrently.

15       Within 72 hours of release from the custody of the

16  Bureau of Prisons he shall report in person to the

17  probation office in the district to which he is released.

18       While on supervised release, he shall not commit

19  another federal, state, or local crime; shall not possess

20  a firearm, as defined in 18 United States Code Section

21  921; and shall comply with the standard conditions that

22  have been adopted by this Court.

23       He shall not unlawfully possess a controlled

24  substance.  He shall refrain from any unlawful use of a

25  controlled substance.  He shall submit to one drug test

1    within 15 days of release on supervised release and two

2    periodic tests thereafter.  He shall cooperate in the

3    collection of DNA as directed by the probation officer.

4         The Court finds that the following special

5    conditions of supervision are reasonably related to the

6    factors set forth at 18 United States Code Section 3553(a)

7    and 3583(d).

8         Further, based on the nature and circumstances of

9    this offense and the history and characteristics of this

10   particular defendant, these conditions do not constitute a

11   greater deprivation of liberty than reasonably necessary

12   to accomplish the goals of sentencing.

13        First, he shall participate in and successfully

14   complete a program of testing and/or treatment for

15   substance abuse, approved by the probation officer, and

16   shall follow the rules and regulations of that program.

17   The probation officer, in consultation with the treatment

18   provider, will supervise his participation in the program

19   as to modality, duration, and intensity until such time as

20   he is released from the program by the probation officer.

21        He shall abstain from the use of alcohol or other

22   intoxicants during the course of treatment, and he must

23   not attempt to obstruct, tamper with, or circumvent the

24   testing methods.  He must pay for the cost of testing

25   and/or treatment based on his ability to pay.

1           Ma'am, if you can't keep it quiet, you can leave

2      the courtroom.

3           The defendant must participate in a program of

4      cognitive behavioral treatment approved by the probation

5      officer and follow the rules and regulation of the

6      program.  The probation officer, in consultation with the

7      treatment provider, will supervise his participation in

8      the program as to modality, duration, and intensity.  He

9      must pay for the cost of treatment based on his ability to

10     pay.

11          He shall submit his person, property, house,

12     residence, papers, computers, other electronic

13     communications or data storage devices or media or office

14     to a search conducted by a United States Probation

15     Officer.  Failure to submit to search may be grounds for

16     revocation of release.

17          He shall warn any other occupants that the premises

18     may be subject to searches pursuant to this condition.  An

19     officer may conduct a search pursuant to this condition

20     only when reasonable suspicion exists that he has violated

21     a condition of his supervision and the areas to be

22     searched contain evidence of this violation.  Any search

23     must be conducted at a reasonable time and in a reasonable

24     manner.

25          He shall also make restitution in the total amount

1   of $180 to U.S. Bank.  Restitution is ordered to be

2   directed to the address provided to the Clerk of the Court

3   by the probation officer.  The Court has determined that

4   he does not have the ability to pay interest, and it is

5   ordered that the interest requirement is waived for the

6   restitution.

7        He shall not incur new credit charges, open

8   additional lines of credit, or obtain or enter into any

9   financing agreement or arrangement without the approval of

10  the probation officer unless he is in compliance with the

11  periodic payment obligations imposed pursuant to the

12  Court's judgment and sentence.

13       As directed by the probation officer, he shall

14  apply any moneys received from income tax refunds, lottery

15  winnings, inheritances, judgments, and any anticipated or

16  unexpected financial gains to the outstanding court

17  ordered financial obligation in this case.

18       He shall make payment on the restitution obligation

19  that remains unpaid at the commencement of supervised

20  release.  And within 60 days of his release, he shall meet

21  with the probation officer to develop a plan for the

22  payment of restitution.  The probation officer will work

23  with the defendant in developing a monthly budget that

24  will be reviewed with the probation officer quarterly.

25       He shall document all income, compensation, or

1    financial support generated or received from any source

2    and provide that information to the probation officer.

3    The plan of payment will be based on his income and

4    expenses, with the restitution amount to be paid in

5    monthly installment payments of at least 10 percent of the

6    defendant's gross monthly income.

7         Because this sentence imposes restitution, it is a

8    condition of supervision that he pay in accordance with

9    this order.  If he has an outstanding financial

10   obligation, the probation office may share any financial

11   or employment documentation relevant to the defendant with

12   the Asset Recovery Division of the United States Attorney

13   Office to assist in the collection of the obligation.

14        He shall pay a special assessment of $200.  The

15   Court finds that he does not have the ability to pay a

16   fine, so the Court will waive the fine in this case.  The

17   payment of the special assessment and restitution

18   obligation shall be due immediately.

19        Pursuant to Rule 32.2 of the Federal Rules of

20   Criminal Procedure, the defendant shall forfeit to the

21   United States any and all property, real or personal,

22   derived from proceeds from the instant offense.

23        Now, Mr. Hester, I do want you to understand, and I

24   want your family to understand, that I take my task of

25   sentencing very seriously, and it is the hardest thing I

1    have to do.  In your case I am looking at you and saying

2    for a lousy 180 bucks, you are going to prison for 92

3    months.

4          THE DEFENDANT:  Can I say something ma'am?

5          THE COURT:  You may.

6          THE DEFENDANT:  Like in this whole report, like,

7    the police lied.  He never tackled me down.  I never had a

8    gun in my hand.  He never got a gun off of me.  I mean,

9    that van did not belong to me, that van was my nephew's

10   friend.  He drove it over there.  And I was just telling

11   her to take the keys out of the van.  I didn't know what

12   was in that van.  That is not my van.  He drove that van.

13   I was in the passenger seat.

14         THE COURT:  All of that is really irrelevant to the

15   sentence.  I mean, you pled guilty to bank robbery and

16   possession of a gun.  And you know you are not supposed to

17   have a gun, period.  You know, it is just sad to me that a

18   young man like you, who seems to me to be very intelligent

19   and you're capable, and yet you have squandered your life,

20   and you have spent more of your life in prison than you

21   have as a free person, and for what?

22         THE DEFENDANT:  What does that say about society?

23         THE COURT:  No, what does that say about you, sir?

24   Not society, what does that say about you?  You are the

25   one who committed the crimes.

1        THE DEFENDANT:  Not only that, all this time that I

2   have been sent to prison, you all been putting me in

3   places with people with life sentences, people carrying

4   knives, and I have to act accordingly, because I am not

5   going to be a victim.  I mean, that is what I am going

6   back to right now.  And, like, it is really doing a

7   disservice to society and everything that you all stand

8   for.

9        THE COURT:  If you can keep from impacting the

10  safety of the community, you wouldn't be in the situation

11  and you wouldn't be going to prison.  I am not going to

12  sit here and argue with you about it.  You committed the

13  crime, unfortunately you have to do the time.  And it is

14  just sad to me that it would be for such a petty amount of

15  money that you would find yourself in this circumstance,

16  and you know better.  You have robbed banks before and you

17  have been caught and you have been sent to prison.

18       In this case, I gave you a bottom-of-the-guideline

19  sentence even though it was recommended by probation that

20  you get a higher sentence.  And I do believe that 92

21  months of imprisonment, with the 3 years of supervised

22  release, and the conditions that I imposed, does reflect

23  the seriousness of your offense and is a sufficient, but

24  not greater than necessary, sentence.

25       Now, although you have waived your appellate rights

1    under the circumstances that are outlined in the plea

2    agreement, to the extent you have not waived your right to

3    appeal and you desire to appeal, that Notice of Appeal

4    must be filed with the Clerk of the Court within 14 days

5    after entry of Judgment or your right to appeal will be

6    lost.

7           If you are not able to afford an attorney for an

8    appeal, one will be appointed to represent you.  And, if

9    you request, the Clerk of the Court must immediately

10   prepare and file on a Notice of Appeal on your behalf.

11          I am sorry, you wanted -- I am torn on this one,

12   but I will recommend that the Bureau of Prisons attempt to

13   designate Mr. Hester to a facility here in Denver because

14   I think that it is going to be important for him to have

15   the support of his mother and his common-law wife.  So it

16   is only a recommendation, they can ignore me, I can't

17   order them to do anything.

18          Any other business to be brought before me?

19          MR. MINSER:  Nothing from the Government.  Thank

20   you.

21          MR. MUHAISEN:  Your Honor, Mr. Hester does have 260

22   days of presentence confinement.

23          THE COURT:  That is up to the Bureau of Prisons.

24   They will calculate that.  I don't do anything with

25   respect to that.

1          All right.  If not, then thank you very much to the

2     Deputy United States Marshals for your assistance.

3          Mr. Hester, best of luck to you.  I hope I don't

4     ever see you in my courtroom again.  I hereby remand you

5     to the custody of the United States Marshal for the

6     District of Colorado.

7          Court will be in recess.

8          THE DEFENDANT:  Could I have my pictures?

9          THE COURT:  Yes, absolutely.

10         (Proceedings conclude at 1:52 p.m.)

11

12         **R E P O R T E R ' S   C E R T I F I C A T E**

13

14         I, Darlene M. Martinez, Official Certified

15    Shorthand Reporter for the United States District Court,

16    District of Colorado, do hereby certify that the foregoing

17    is a true and accurate transcript of the proceedings had

18    as taken stenographically by me at the time and place

19    aforementioned.

20

21         Dated this 4th day of October, 2022.

22         _____

23    _____

24         s/Darlene M. Martinez

25         RMR, CRR